Smith v. U.S. Attorney General Okay, Mr. Sansone, you're representing the petitioner this morning. You may begin. Good morning, your honors, and may it please the court. Where a state criminal statute allows conviction for unintentionally causing a death, the board's decision in Taft for determining whether the statute describes a crime involving moral turpitude. On the turpitudinous side of the line are statutes requiring proof that the defendant acted with, quote, actual awareness of the risk created, close quote. On the non-turpitudinous side of the line are statutes that permit conviction even where a defendant, quote, exhausted his remedies here. So that's statutory here, unlike the case that you cited to us in this supplemental letter the other day, which involved a judicial doctrine of exhaustion. This is statutory in 1252. And at the removal hearing, your client did not dispute whether homicide is a crime involving moral turpitude. Instead, he was arguing about the aggravated assault conviction. After the immigration judge found him to be removable, he said that, insofar as this conviction was concerned, that it was not like I was swerving all over the place. But he didn't make the argument that you're making today, it seems to me. What am I missing? Your Honor, you're correct that he did not argue the issue of moral turpitude in front of the immigration judge. Nothing in board regulation, no agency practice required him to do so. We're from the practical realities of what proceedings before the IJ look like. In proceedings before the IJ, the government bears the burden of proving that the noncitizen is removable. And because IJs regularly deal with pro se, legally untrained noncitizens who may not speak English and are often appearing remotely from a detention facility, the IJ will often do what the IJ did here, which is to take the lead and require the government to defend its legal theory on the complex and technical issue of removability. As we see at AR 342, 360, 363, and 499 through 501, the IJ requested and received government argument aimed at determining whether Mr. Smith's vehicular homicide convictions were legally capable of supporting removal. Mr. Smith never conceded removability. He held the government to its burden. And after the IJ accepted the government's arguments, Mr. Smith did exactly what he was supposed to do under agency regulations. He appealed to the board, contesting the IJ's legal conclusion on removability and raising exactly the legal challenge that he raises here. Yeah, he had raised the new argument for the first time. Your honor, he raised the argument exactly as board regulations permitted him to do. The board could have treated it as forfeited, right? I'm not aware of anything in board precedent that does any forfeiture rules under board precedent or board regulations. Are you familiar with the matter of JYC that the board issued in 2007? I'm not, your honor, but I'm happy to submit supplemental briefing on the effect of that case or any other. Is the critical distinction here, Mr. Sanson, that you're drawing on this jurisdictional question, that in this case, the burden rested with homeland security, with the government to establish that he was removable because he committed a crime of moral turpitude. And therefore, he wasn't obliged to say or do anything with regard to that, as opposed to a circumstance where he was seeking asylum or the withholding of removal on one grounds or another, well-founded fear of persecution, a violation of the convention against torture, something like that, where he couldn't sit on his thumbs in that circumstance, say nothing, and then for the first time raise it before the Board of Immigration Appeals, where the burden was placed by the law on him. But here, the burden rested with the government to establish by clear and convincing evidence that he was removable because he had committed a crime of moral turpitude. Is that the distinction you're drawing? That's absolutely correct, Your Honor. And I think that rationale is underscored in a case like this, where the IJ made clear that he was inquiring himself into the legal issues surrounding removability. Under those circumstances, a pro se non-citizen representing himself is going to sort of take the IJ at his word, the fact that the IJ is looking into these legal issues and holding the government to its burden. The other thing I would say, Your Honors, is that the rationale for this court's issue exhaustion precedent, as set out in Amaya Artunduaga, is that the exhaustion requirement ensures that the agency considers the issue and all of its contours in the context of adversarial presentation and compiles a record that's adequate for judicial review. Mr. Smith's detailed briefing before the board satisfied both of these requirements. And, you know, we may have a different case if the board had ruled on some kind of exhaustion or forfeiture or waiver rule. But here, Mr. Smith did everything that he needed to do before the agency. The agency never said otherwise. He certainly was free to contest the government's a crime of moral turpitude, and he didn't. I mean, he was given the opportunity. He could have argued. The IJ said, okay, I want to look at whether this is really a crime of moral turpitude. Government, you got the burden. Give me a brief. Government supplies a brief. He could have turned around and said, no, that's wrong. It isn't a crime of moral turpitude. Even if it isn't a question of subject matter jurisdiction, would there have been a waiver on his part for not having controverted the government's position that this was a crime of moral turpitude? And having raised that issue only for the first time when counseled for the BIA. We're not aware of any cases that would make that to the extent it is a waiver. We're not aware of any cases that would make this court deem that a waiver where it was raised, presented, argued to the agency without any objection from the government, without any ruling of waiver or forfeiture by the board. No, I agree. The government has not argued waiver here in any way. I'm just asking the question whether it was effectively a waiver when he said nothing and gave the IJ every reason to believe that he didn't really dispute that this was a crime of moral turpitude. After all, the whole debate was whether he could present mitigating circumstances to lead the IJ to conclude while the crime was a bad one, it really wasn't as bad as it otherwise sounded because X, Y, and Z occurred, as opposed to saying, this is not a crime of moral turpitude. The IJ would have walked away saying, this guy's not disputing that it's a crime of moral turpitude as a matter of law. He's just giving me some facts that bear upon the wisdom and efficacy of exercising my discretion, which is a completely different question. That's how I see what happened here. And I'm just asking whether that wasn't a waiver. Let me change it. Suppose he actually walked in before the IJ, counseled at the time, and the lawyer at the time simply was looking for an exercise of discretion and never challenged the government's assertion that it was a crime of moral turpitude. Would you then turn around and raise it for the first time in the BIA? Whether or not under board regulations, the board would have been entitled to treat that issue as waived. I'm not certain, and I'm happy to look into that and provide supplemental briefing. But the fact that the board... I'm sorry. I really didn't mean to take you too far off on the underlying question of whether or not this was a crime of moral turpitude. And it would certainly help me if you could address that. Certainly, your honor. The board in this case didn't cite McCreery, the Florida Supreme Court's only authoritative interpretation of the vehicular homicide elements. But McCreery's analysis is critical to understanding the unique statutory scheme that Florida enacted to cover unintended traffic fatalities. In McCreery, a driver carelessly ran a stop sign he should have seen but didn't, causing a fatal crash. He wasn't intoxicated. He wasn't even speeding. The Florida Supreme Court acknowledged that this conduct could not be prosecuted under the which covers unintended deaths arising from, quote, gross and flagrant, close quote, conduct that, quote, raises the presumption of a conscious indifference to consequences, close quote, conduct like drag racing or playing chicken. But McCreery held that the prosecution was permitted under the vehicular homicide statute, through which the Florida legislature, quote, intended and did create a lesser included offense with a lesser standard of proof, close quote. And the prosecutor in McCreery could carry that burden by showing the sign was clearly visible and the driver had run it and a death resulted. The vehicular homicide statute, in other words, empowered prosecutors to proceed against less flagrant conduct from which actual indifference to risk. But it may have been less than culpable negligence, but the Florida Supreme Court clearly says it's more than common law or statutory negligence, right? That's correct. It is more than ordinary civil. What is it that takes it out of common law negligence? I think it's the degree of whether or not a sort of reasonable driver sitting where the driver sat should have realized that that conduct was risky. And I think it's the degree of sort of departure from the ordinary standard of care that brings negligence from the civil into the criminal realm. There are a few requirements here, though. So you've got, all of this, it seems to me, goes to the culpable mental state. But it seems to me that's irrelevant if it's nevertheless reprehensible conduct. No? I don't believe so, Your Honor. I believe that under board precedent to constitute a crime involving moral turpitude, there must be both a culpable mental state and reprehensible conduct. And I believe my time has expired. Well, can you, I just, I have an additional question. Certainly. I'm trying to understand why this isn't a crime of moral turpitude. Your argument, if I get it right, boils down to this. Some of the intermediate appellate courts, the DCAs, use language like reasonable foreseeability. And that language necessarily is the language of normal negligence. And that's not enough to constitute the requisite state of mind, willful, wanton, something like that. The problem that I have with the argument is, while those DCA cases use reasonable foreseeability, they're using it in a peculiar way in the context of a criminal statute. And it seems to me that this is not just common law negligence we're talking about, which is the language of reasonable foreseeability. We use that when we talk about proximate cause. But the Florida Supreme Court has told us clearly that ain't enough. Now, isn't it clear that for a violation of the reckless driving criminal statute, that's the 316.192 statute, willful means either intentional, knowing, and purposeful, or wanton, conscious, and intentional, indifference to the consequences. And if that's what 316 means, and if 316 is necessarily a lesser included offense of vehicular homicide, then isn't it clear that you need something more, and something that really falls into the range of moral turpitude conduct? Not necessarily, Your Honor. And the reason for that is that willful and wanton don't have a sort of fixed meaning across jurisdictions. So what the categorical approach obliged the board to do was to look at how that standard is applied in concrete cases. And what we have in McCreary is the prosecutor carrying its burden of proving recklessness beyond a reasonable doubt by saying, here was a stop sign, it was visible. You ran it. And that's sufficient. But you're right about that. We would need to send it back to the agency for it to conduct the proper inquiry. That's correct. Either that, Your Honor, or certify to the Florida Supreme Court. You're missing the question, and maybe I didn't put it sharply enough. If he had been charged with reckless driving, and convicted of reckless driving under 316, in order to be convicted of that, it is absolutely clear in Florida that you need more than common law reasonable foreseeability. You need either willful or wanton, which means either conscious act or intentional indifferences to the consequences, personally, subjectively, by the defendant. If that's what he was charged with, wouldn't that be a crime of moral turpitude if he was convicted of that? Not necessarily, Your Honor. And the reason for that is that if in practice prosecutors are not tasked with proving an actual awareness of a risk, and under the standard Florida jury instructions for the vehicular homicide statute, all the way up until 2015, including 2008, when Mr. Smith was convicted, juries were not tasked with finding that. They were tasked with finding, was the driver driving, quote, in a reasonable- The problem with the jury instructions is the most difficult part of this case for me. But the Florida Supreme Court has said that the jury instructions do not constitute the law of Florida as we're deciding it. We get to decide the issue, not the promulgation of a standard instruction. And if, in fact, a violation of reckless driving requires some kind of willful or wanton conduct, then it seems to me to be as clear as night follows day. And if that's a lesser included and the greater crime is vehicular homicide, vehicular homicide would have to require the same kind of willful and wanton conduct. What am I missing in that chain of reasoning? What your honor may be missing is the frequent language of reasonable foreseeability is used to describe what it is that a prosecutor has to prove. In other words, if we take the facts of Innocencio, for example, we have a driver who makes a pass in foggy conditions on a two-lane highway, causes a fatal accident. There are two potential drivers there, right? Driver A realizes that this is extremely risky and decides, I don't care, I'm in a rush, I'm going to go ahead and do that anyway. Driver B is just maybe a bad driver who misjudges conditions, is overconfident in her ability to pass quickly, doesn't realize that visibility is impaired to the degree it is, and causes an accident purely not through an intentional, you know, deliberate indifference to the mortal peril she's creating, but just makes a mistake that another driver could well make. What McCreary holds is that the vehicular homicide statute was enacted in order to lift the burden from prosecutors of having to show that it was driver A or driver B behind the wheel. Rather, as long as the conduct viewed objectively is sort of sufficient that a reasonable driver sitting where that driver sat should have recognized the risk, that's enough. Okay. Mr. Sansone, you've gone six and a half minutes over, much of that answering questions from the court. I don't know that we're going to get much more productive with that. So you've saved your couple minutes for rebuttal. Mr. Hayes. Good morning, your honors. May it please the court, Timothy Hayes on behalf of the attorney general. I'll start with exhaustion. We agree with petitioner that this issue was exhausted before the agency. And the reason is for the reason that Judge Marcus outlined, which was the government initiated this. And so this isn't like where you have an applicant for asylum or immigration relief who has to exhaust his remedies. The burden was on the government here. Well, that's part of it. But it's more, if you look at the language the court used in the Maya decision, where it said that even if the board reaches an issue sui sponte, we're going to say that is not exhaustion because we expect good briefing before the board on the issue. And we want the court to actually decide the issue on good briefing below. At all stages here, this was briefed. It was briefed before the IJ. It was briefed before the board. And the board exercises discretion and consider the issue. This might be a different case if, for example, this was an asylum case where we had a PSG, which is a particular social group. So I'll go on. Yeah, it seems the parties are in agreement about that. So let's move to the other issue. Yes, Your Honor. The issue here is that third element in the vehicular homicide statute, which is in a reckless manner likely to cause the death of or great bodily harm to another. That, as Judge Marcus was saying, that necessarily includes reckless driving. So we go down to reckless driving. And we see that the Florida statute defines wanton as a conscious and intentional indifference to consequences. And with the knowledge that damage is likely to be done to persons. As I understand petitioner's argument, it's a little nuanced. It's as if they don't have to prove that they intended to cause that particular death. And I guess under the Florida case law, that could be correct. You can construe some of those intermediate Florida appellate courts as making that argument. But that doesn't matter under the board's definition. I mean, as the board clarified in a matter of lieu, the perpetrator must have knowledge, well, not of the risk of having caused the particular injury issue of the facts that make the injury likely. And if we look at all the case law, including matter, excuse me, D versus state, which is one of the Florida intermediate court cases they rely on. It says the person must have reasonably foreseen that the same general type of harm might occur if he or she knowingly drove a vehicle under circumstances that would likely cause death, a great bottle of harm to another. So they must have knowledge of the facts of how they're driving. I think that alone, coupled with the fact that serious harm is likely is enough. And that's enough even to put it under the matter of flaw decision, which is that one that says conscious disregard of substantial risk of serious harm. But even if that were not enough, the matter of lieu decision, which came out after that covers the scenario. One of the cases that petitioner relies on a lot is this matter of ditch civilly case, which I know I'm mispronouncing and I apologize, your honors. But if I draw your court's attention to footnote four of that decision, it says that in that case that was dealing with a New York criminal negligence statute, it was negligent conduct. And it said the problem the board had with that case was it did not require the defendant to have any awareness. And I emphasize any awareness of the facts that make his or her conduct dangerous. A conviction under the vehicle homicide statute, even passing in fog, requires awareness that you are doing something that is likely to cause harm. So that kind of puts it out of the negligent case law as far as the board is concerned. Let me ask you a little bit about that. The problem that I've had with that argument and looking at the intermediate appellate court cases is some of them say two things. They say, yeah, it's true that under Florida Supreme Court law, the law requires something more than negligence and something less than culpable negligence. And the legislature created this statute to cover something more than negligence, but less than what they called culpable negligence. And then when they describe what that means, at least three or four of those DCA cases speak to whether it was reasonably foreseeable that death or great bodily harm could result. That's the language of common law negligence. We speak of reasonable foreseeability when we look at proximate cause. And that's a standard that's generated by negligence, not something more. And it's a standard that looks at what a reasonable person would apprehend rather than the subjective state of mind of the criminal defendant in the case. And that's what threw me off. But it's clear that even though they use the language of reasonable foreseeability, they know because the Florida Supreme Court has told them that it's more than negligence. I'm just asking you to help me deal with this use of whether it was reasonably foreseeable that some great bodily harm would result. Well, when they say that, they said that, let me look at the thing. Okay, so must have reasonably foreseen that the same general type of harm might occur if he or she knowingly drove a vehicle under circumstances. So it's saying that that person must have foreseen that because she knows how she was driving her vehicle. So again, the Board of Matter of Wu had a similar statute to that in California. And it said, you know, we know that the perpetrator might not have knowledge of the risk of having caused the actual injury. But they must know that the facts that make that injury likely, that they were driving under circumstances that would make that injury likely. I think even under the intermediate Florida appellate court decisions, that is the case. And that would be enough under the Florida's definition of, excuse me, under the board's generic definition of whether reckless crimes qualify as moral turpitude. It might not strictly qualify under some state case law as far as what reckless is, but it certainly satisfies the board's generic definition. And then, well, unless your honors have any further questions, I ask that the court please deny the petition for review. Thank you. Thank you, Mr. Hayes. Mr. Sansone, you saved a couple minutes for rebuttal. Thank you, your honors. We agree with the government that under Florida law, more than ordinary civil negligence is required for a vehicular homicide conviction. The question is whether it requires more than the sort of criminal negligence, the sort of gross deviation from an ordinary standard of care that was required, that was insufficient to support a finding of turpitude in Tov Didi-Shvili. Now, the government has said that the Florida statute, quote, requires awareness that you are likely to cause harm, close quote. That just isn't supported under the cases. If we look at McCreery, what we see is the court saying vehicular homicide was designed to cover those cases where the conduct doesn't deviate so far, not like playing chicken, not like drag racing through a stop sign, where we can't necessarily presume a conscious indifference. And that's why lower courts applying McCreery have held it to be sufficient for the prosecutor to prove the elements where all that the prosecutor demonstrates is that a reasonable driver sitting where the driver sat should have discerned a risk. Now, the government also relies extensively on Matter of Woo, and Matter of Woo concerned a, quote, unique statute that consisted of, quote, aggravating factors that indicate the perpetrator's moral depravity, close quote. It wasn't a case involving careless driving errors, and that's probably why the government didn't cite it below and the board didn't rely on it. So you said that as you read the case law, all the prosecution has to establish in order to sustain the conviction for vehicular homicide is a standard involving whether a reasonable driver should have discerned the risk. How is that different from common law statutory negligence? I think it's a matter of order. I think it's a matter of degree, Your Honor, depending on how far from the reasonable benchmark the driver departs. And I see my time has expired if I may briefly conclude. You can finish your, yeah. Florida's vehicular homicide statute can be and has been used to prosecute tragic results of negligent driving errors, like accidentally running a stop sign. That conduct is not so categorically base, vile, and depraved that it can justify deporting a lawful permanent resident of 47 years back to a country he has not seen since he was a 12-year-old boy. We urge this court to vacate the removal order and remand to the board. Thank you. Thank you, Mr. Sansone.